Annette DAVIDS, Bert Davids, Shannon Miller, Verna Johnson–Miller, Sheila Powless, Robert Chicks, Leonard Miller III, and Tammy Pecore, Plaintiffs,

v.

Laura COYHIS, Harvey Martin, Arnold Tousey and William Moede, Defendants.

The STOCKBRIDGE–MUNSEE COMMUNITY BAND OF MOHICAN INDIANS, a federally recognized Indian Tribe, Plaintiff,

v.

Bruce MILLER, Darrel Mason, Leah Miller–Heath, Terry Terrio, Carolyn Miller, Greg Miller, Marcelene Sparks, Blake Smith, Dave Koller, Terrance J. Miller, Leonard ("John") Miller III, Tammy Pecore, Debra Lemieux, and Cynthia Harris, Defendants.

Civ. A. Nos. 94–C–689, 94–C–709.

United States District Court, E.D. Wisconsin.

July 13, 1994.

**642**

Brian L. Pierson, Irvin B. Charne, Hall, Patterson & Charne, S.C., Milwaukee, WI, for plaintiffs in 94–C–689 & defendants in 94–C–709.

John A. Busch, Grant C. Killoran, Michael, Best & Friedrich, Milwaukee, WI, for plaintiffs in 94–C–709 & defendants in 94–C–689.

Richard Duncan, Faegre & Benson, Minneapolis, MN, for plaintiffs in 94–C–709 & defendants in 94–C–689.

### ORDER

TERENCE T. EVANS, Chief Judge.

These related cases grow out of political unrest within the Stockbridge–Munsee Community Band of Mohican Indians (hereinafter referred to as the "Tribe" or the "Community"), a federally recognized Indian Tribe which occupies a reservation in Shawano County, Wisconsin. The Tribe is governed by its Tribal Council, a seven-member body consisting of a president, vice-president, treasurer, and four other members, who are elected by popular vote. Tribal Council members are elected by the Community pursuant to procedures specified in the Tribe's Constitution; the members are elected to serve one-year terms, with the exception of the president and treasurer who are elected to serve two-year terms. For an individual to be elected president, vice-president, or treasurer, he or she must expressly run for, and be elected to serve in, that particular position. All seven members of the Council have equal votes, and four votes (on all regular Tribe business) are necessary for the Tribal Council to take official action. The present members of the Tribal Council, elected in a duly authorized election in December 1993, are: Laura Coyhis, president; Virgil Murphy, vice-president; Linda Mohawk, treasurer; Steve Davids; William Moede; Arnold Tousey; and Harvey Martin.

Through the Mohican North Star Casino and Bingo Enterprise, a separate, tribally chartered business organization, the Tribe owns and operates the Mohican North Star Casino in Bowler, Wisconsin. The Casino is operated pursuant to the Indian Gaming Regulatory Act (the "IGRA"), 25 U.S.C. § 2701 *et seq.*, the Stockbridge–Munsee Gaming Ordinance, and the Stockbridge–Munsee/State of Wisconsin Gaming Compact

of 1992 (the "Tribal/State Compact"). The Gaming Ordinance provides for the establishment of a Gaming Board to monitor the Tribe's gaming enterprises and ensure compliance with all policies, procedures, and regulations. The Gaming Board members are appointed by—and may be dismissed by—the Tribal Council. Tribal Gaming Ordinance § VIII(J). The day-to-day operations of the Casino are handled by the Casino's management staff. Two staff positions, the general manager and financial manager, are hired directly by the Tribal Council. *Id.* § VIII(K). All money received from the operation of the Casino must be deposited in a special bank account containing only Casino proceeds. *Id.* § VII(A). Checks written on this special account must be signed by the Casino's general manager and a designated member of the Gaming Board. *Id.*

Earlier this year, a difference of opinion in the way the Tribal Council should operate caused a rift among the present members of the Council. Ms. Coyhis, with the support of Council members Moede, Tousey, and Martin, formed a voting majority which, pursuant to the Tribal Constitution, became authorized to take Council action without the cooperation or approval of the remaining three Council members. Apparently out of frustration at Ms. Coyhis's ability to control the Council's agenda without their approval, the three minority Council members rallied support from other members of the Tribe and, on June 18, 1994, held a "special election" to "elect" a new tribal council. Neither the special election nor the new tribal council is recognized by the United States Department of the Interior's Bureau of Indian Affairs. Nevertheless, the dissident Council members and their followers, which include the Casino's assistant general manager and at least some of the members of the Gaming Board, refuse to recognize the Coyhis coalition's authority. The dissident faction has allowed its frustrations (playing by the rules can sometimes be frustrating!) to create a situation of instability and chaos, both with respect to the government of the Tribe and the operation of the Casino. Money, lots of it, is being lost and the stability of the tribal government is being threatened. Also, violence is in the air and these lawsuits have been filed. All is not well on the reservation.

On June 23, 1994, Annette Davids, Bert Davids, Shannon Miller, Verna Johnson–Miller, Sheila Powless, Robert Chicks, Leonard Miller III, and Tammy Pecore, all enrolled members of the Stockbridge–Munsee Tribe, filed case number 94–C–689 in this district. Annette Davids, Bert Davids, Shannon Miller, Verna Johnson–Miller, and Sheila Powless are members of the Gaming Board. Robert Chicks is Director of Economic Development for the Tribe. Leonard Miller III is Director of Support Services at the Casino. Tammy Pecore is Director of Operations/assistant general manager of the Casino; she has been acting as general manager of the Casino since May 27, 1994, when the former general manager resigned. The four majority members of the Tribal Council—Laura Coyhis, Harvey Martin, Arnold Tousey, and William Moede—are named as defendants in the case.

In their complaint, the plaintiffs in 94–C–689 allege that Ms. Coyhis and her cohorts established an unauthorized bank account for the purpose of diverting gaming revenue from the Casino's special bank account. The establishment of this new account, plaintiffs allege, constituted a violation of section VII(A) of the Tribal Gaming Ordinance which, as noted above, requires the Tribe to maintain a special account to hold only gaming receipts, with signature authority vested in the Casino's general manager and a designated member of the Gaming Board. In addition to this violation of the Gaming Ordinance, plaintiffs allege that the Coyhis majority appointed an acting treasurer and appropriated control over tribal funds in violation of the Tribe's Constitution. Finally, they allege that the Coyhis group appointed individuals to the Gaming Board who were not eligible to serve as members pursuant to the provisions of the Gaming Ordinance, and that they employed a Casino general manager without performing a background check in violation of the IGRA and the Tribal/State Compact.

On June 29, 1994, the recognized Tribal Council (*i.e.*, the Coyhis majority), on behalf of the Stockbridge–Munsee Community, filed

case number 94–C–709, naming as defendants Bruce Miller, Darrel Mason, Leah Miller–Heath, Terry Terrio, Carolyn Miller, Greg Miller, Marcelene Sparks, Blake Smith, Dave Koller, Terrance J. Miller, Leonard ("John") Miller III, Tammy Pecore, Debra LeMieux and Cynthia Harris. All defendants are enrolled members of the Tribe. Leah Miller–Heath, Terry Terrio, Carolyn Miller, Greg Miller, Marcelene Sparks, Blake Smith, and Dave Koller are members of the unrecognized tribal council; Terrance J. Miller is Director of Surveillance at the Casino; Debra LeMieux is vault manager of the Casino; and Cynthia Harris is the assistant financial manager of the Casino. Leonard ("John") Miller III and Tammy Pecore, who are also named as plaintiffs in 94–C–689, are Director of Support Services and Director of Operations/assistant manager of the Casino, respectively.

In its complaint, the "Community" alleges that defendants physically prevented majority members of the recognized Tribal Council from entering the tribal government offices and the Casino, forcing them to set up temporary headquarters, denying them access to books and records necessary to govern the Tribe, and preventing them from supervising the Casino's operation. The Community also alleges that defendants wrongfully removed funds from the Casino, and that they refused to close the Casino temporarily to conduct an audit of funds and to alleviate any potential danger to Casino patrons and other members of the Tribe, despite a Tribal Council vote in favor of doing so. The Community alleges that defendants' conduct violates RICO, 18 U.S.C. § 1691 *et seq.*, the IGRA, and the Tribe's Gaming Ordinance, and that defendants' actions constitute a trespass of tribal property and conversion of tribal assets.

In addition to its complaint, the Community filed a motion for a temporary restraining order. In this motion, the Community asks the court to enter an order restraining defendants from (1) preventing any member of the real Tribal Council from gaining access to tribal headquarters; (2) interfering with the Tribal Council's ability to govern or supervise the Casino; and (3) removing any funds or property from the Casino or the tribal headquarters. When the Community subsequently learned that defendants had removed all of the funds from the Casino's vault and gaming machines and deposited these funds in an account at Norwest Bank Wisconsin, N.A.,[1] it revised its request for a TRO, asking the court to issue an order enjoining defendants from (1) preventing Tribal Council members from gaining access to tribal headquarters; (2) preventing Tribal Council members from gaining access to the Casino; (3) interfering with the Tribal Council's ability to govern the Community or supervise the Casino (including but not limited to interfering with the Tribal Council's ability to change the signature cards on the Norwest Bank accounts and any other bank accounts opened by defendants with Casino proceeds); and (4) removing any funds and/or property from the Casino or tribal headquarters.

The two cases have been assigned to Judge J.P. Stadtmueller. Because the situation required quick action, and because Judge Stadtmueller was involved in a jury trial, he sent the cases to me for the limited purpose of hearing the Community's request for relief in case 94–C–709. I conducted an evidentiary hearing in the matter on July 8, 1994. During the hearing, both sides were given an opportunity to present evidence and testimony in support of their respective positions. I heard arguments, ably presented by Richard Duncan, counsel for the Community, and Brian Pierson, counsel for the defendants. I also heard testimony from Laura Coyhis, Tammy Pecore, and Annette Davids. It was agreed at the hearing that the request for a TRO was more appropriately viewed—because notice and the hearing were provided—as a request for preliminary injunctive

---

1. At a hearing held in connection with this matter on July 8, 1994, Tammy Pecore testified that, on June 22, 1994, she opened several accounts in the Casino's name at the Green Bay branch of Norwest Bank Wisconsin, N.A. and deposited at least $2 million in funds removed from the Casino's vault and gaming machines.

Pursuant to a request from Richard Duncan, counsel for the Community, Norwest agreed to freeze the assets in the Casino's accounts pending judicial resolution of this dispute.

relief. My decision on the Community's motion follows.

▇ In their opposition papers, the defendants argue that the court lacks jurisdiction to decide the issue of access to tribal headquarters as it is essentially an intratribal dispute over the legitimacy of the tribal government. Defendants contend that the court "has no jurisdiction to prohibit any of the defendants from occupying the tribal headquarters, from interfering with the Coyhis majority's government of the community or from removing funds or property from the tribal headquarters." This claim need not detain me for very long. I believe that jurisdiction is clearly present.

To support their jurisdictional challenge, defendants rely on several cases, none of which are from this district and none of which persuade me that jurisdiction is lacking. In *Runs After v. United States,* 766 F.2d 347, 352 (8th Cir.1985), one of the cases on which defendants rely, the Eighth Circuit affirmed the district court's holding that resolution of disputes involving questions of interpretation of a tribal constitution and tribal law are not within the jurisdiction of the district court. However, *Runs After* was an action initiated by members of the Cheyenne River Indian Reservation against members of the Tribal Council challenging two tribal resolutions barring certain individuals from holding elected tribal office and disqualifying other individuals from running in a general tribal election. The district court characterized the dispute as an intratribal election dispute within the exclusive jurisdiction of the tribal court, and accordingly denied plaintiffs' motion for preliminary injunctive relief and dismissed the action.

In *Wisconsin Winnebago Business Committee v. Koberstein,* 636 F.Supp. 814 (W.D.Wis.1986), another case on which defendants rely, plaintiffs challenged the certification of members and officers of the Tribal Council; they also asked the court to determine the validity of a bingo management contract and to order an accounting for the period during which the bingo management contract was in effect. The district court dismissed the action for lack of subject matter jurisdiction. Specifically, the court held

that it did not have jurisdiction to resolve the tribal dispute because it lacked authority to interpret the bingo management contract which the BIA had declared to be void. Finally, the court noted that it did not even have jurisdiction to order an accounting: "To find jurisdiction this federal court would be required to determine the rights of at least two contestants in a tribal election dispute. The Court ... believes the primary question, that of interpreting the tribal constitution and bylaws, cannot be accomplished by judicial intervention at this time."

In *Wheeler v. U.S. Department of Interior, Bureau of Indian Affairs,* 811 F.2d 549 (10th Cir.1987), the Tenth Circuit decided the narrow issue of whether the Department of the Interior has authority to interfere in a tribal election dispute when the tribe provides administrative and judicial procedures for contesting its elections. *Id.* at 550. The Tenth Circuit held that it does not, and that the courts have no authority to order the Department to invalidate a tribal election. *Id.* at 553. *Wheeler v. Swimmer,* 835 F.2d 259 (10th Cir.1987), also involved a tribal election; the district court found that the case involved purely intratribal political controversies and declined to assume jurisdiction.

None of these cases suggests that jurisdiction is lacking in this case. The action filed by the Community is not about an intratribal election dispute; it is about a group of dissidents taking over the Tribe's headquarters and its principal money-making enterprise and absconding with the proceeds of that enterprise.

In *Tillett v. Hodel,* 730 F.Supp. 381, 384 (W.D.Okla.1990), *aff'd,* 931 F.2d 636 (10th Cir.1991), another case on which defendants rely, one member of the Kiowa Tribe brought an action alleging that certain tribal officials had misused tribal funds. There, the court held that

> [t]he issues raised by plaintiff involve the relationship of a citizen of a tribe to her tribal government.... The issues of the alleged misuse of tribal funds and the effectiveness of the recall are clearly intratribal disputes involving only Indian parties and there is no showing that tribal

remedies are unavailable. The matter is an internal political issue to be resolved by the Kiowa Tribe.

Because both parties had invoked the jurisdiction of the BIA, the court dismissed the action to permit plaintiff to pursue tribal remedies. *Tillett* differs from this case in that it involved a claim made by one member of a tribe; in our case, the Community is the plaintiff and it is seeking to recover tribal funds from several members of the Tribe. Actually, the facts of *Tillett* are more similar to those of the first case filed, 96–C–689. *Tillett* would more appropriately be used to support a claim by the defendants in 94–C–689 that the court lacks jurisdiction over the dispute.

In sum, I do not believe that defendants' jurisdictional challenge has merit. The Community's complaint does not present a purely intratribal political dispute; this dispute involves a Casino which is frequented by the general public, the alleged theft of that Casino's funds, and the attempts by the Tribe's governing body to reopen the Casino, ensure the safety of the patrons and continue the revenue stream from the Casino to the Tribe. Without much difficulty, I conclude that the district court has federal question jurisdiction over the issues raised in 94–C–709. Now to the merits.

The Court of Appeals for this circuit has held that a party seeking preliminary injunctive relief must show that (1) no adequate remedy at law exists; (2) the moving party will suffer irreparable harm absent injunctive relief; (3) the irreparable harm suffered in the absence of injunctive relief outweighs the irreparable harm the defendant will suffer if the injunction is granted; (4) the moving party has a reasonable likelihood of success on the merits; and (5) the injunction will not harm the public interest. *United States v. Rural Electric Convenience Co-Op. Co.*, 922 F.2d 429, 432 (7th Cir.1991); *Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1014 (7th Cir.1990); *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir.1987), *cert. denied*, 485 U.S. 993, 108 S.Ct. 1301, 99 L.Ed.2d 511 (1988). In order to prevail, the plaintiff must satisfy each element of this five-part test. *Somerset*, 900 F.2d at 1015

(citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386–87 (7th Cir. 1984)).

■■■ With respect to the balance of harms factor, the court prescribes a "sliding scale" analysis: the more likely the movant is to prevail, the less heavily the balance of harms need weigh in his favor; the less likely he is to prevail, the more heavily it must weigh in his favor. *Ping v. National Education Ass'n*, 870 F.2d 1369, 1371–72 (7th Cir.1989); *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 387 (7th Cir. 1984). Further, with respect to the likelihood of success on the merits factor, which generally weighs most heavily in a court's determination, the court has held that the threshold is low; "[i]t is enough that 'the plaintiff's chances are better than negligible....'" *Roland*, 749 F.2d at 387 (quoting *Omega Satellite Products Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir.1982)).

■■■ The Community argues that it has no adequate remedy at law because monetary damages will not be sufficient to restore the integrity of the tribal government, which is being eroded by the rogue actions of the defendants. Further, the Community argues that defendants' actions have irreparably harmed it in that they have jeopardized its sovereignty and well-being. Specifically, the Community argues that defendants, by denying four of the Tribal Council's members access to books and records located in the tribal headquarters, have wrongfully interfered with the lawfully elected Tribal Council's ability to govern the Community. It argues that, unless the Tribal Council is guaranteed access to the Casino and its books and records, and unless the Council is permitted to exercise control over the Casino's bank accounts, the Community is at great risk of financial loss through theft and/or mismanagement of the Casino.

As to the requirement regarding the balance of harms, the Community argues that "[s]ince defendants will eventually be forced to relinquish the Community property they wrongfully usurped, they will suffer no harm if they are temporarily enjoined from occupying that property." Moreover, the Commu-

nity contends that the likelihood that it ultimately will prevail on its RICO, IGRA, trespass and conversion claims is quite high. Finally, the Community argues that the entry of a preliminary injunction will best serve the important public policies of furthering tribal economic development and self-sufficiency and promoting strong tribal government, in that it will aid in the restoration of the properly elected, recognized governing body. The entry of a preliminary injunction will also serve to prevent violence and further unlawful activity.

Based on the written and oral submissions and the evidence offered at the July 8 hearing, I find that the Community's request for preliminary injunctive relief should be granted. The Community has established that, absent court intervention, it will suffer irreparable harm. Without the funds taken from the Casino's vault and gaming machines, the Casino cannot reopen and the Tribe will lose thousands of dollars in gaming revenue. Perhaps more damaging than the loss of profits, however, is the loss of confidence the public has in the Casino's operation. This erosion in public confidence increases with each day the Casino remains closed, and will be difficult to reestablish even when the Casino opens again. In addition, and more importantly, the defendants' actions have seriously undermined the Tribal Council's ability to govern. The Tribe's Constitution vests in these elected individuals the authority to implement policies and practices to maintain order and further the economic, social, and cultural development of the Tribe. The Council's ability to function is dependent on the Tribe's respect for its authority, which has clearly been diminished by defendants' actions. The longer the Tribe's dissident members are permitted to operate in deliberate disregard of the will of the Council's majority, the more the governing structure contemplated by the Tribe's Constitution is damaged. To deny injunctive relief here would be to encourage a coup d'etat.

In addition to establishing the inadequacy of legal remedies and that the Community will suffer irreparable harm, the Community has demonstrated that its chances of ultimately prevailing on the merits are better than negligible. As noted above, in its complaint the Community alleged violations of RICO, the IGRA, and the Tribal Gaming Ordinance; it also alleged causes of action for trespass and conversion. The Community alleges that defendants' actions—their use of threats of force to exclude the tribal government from the Casino, their operation of the Casino in violation of the IGRA and the terms of the Tribal/State Compact, and their improper removal of Casino funds—constitute racketeering activity. The Community further alleges that defendants' actions violate the IGRA, which requires that the tribal Community have the sole proprietary interest and responsibility for conducting any gaming activity. In support of these claims, the Community submitted various affidavits to establish that defendants or their agents took money from the Casino's vault and gaming machines. At the July 8 hearing, Ms. Pecore testified that she emptied the Casino's vault and slot machines and deposited this money into accounts she and Annette Davids set up at the Green Bay branch of Norwest Bank. Although Ms. Pecore and Ms. Davids may truly believe that they were acting in the Tribe's best interest when they diverted these funds into the new accounts, they simply did not have the authority to do so. Those funds belong to the Tribe, and the Tribal Council, as the recognized governing body of the Tribe, has the exclusive authority to manage those funds. See Stockbridge–Munsee Constitution Article VIII, § 1(e) (empowering Tribal Council to manage all economic affairs and enterprises of the Community); Gaming Ordinance § VIII(F) and (G) (Tribal Council shall give final approval to all gaming-related policies and procedures; Tribal Council shall establish the use of gaming revenues according to tribal needs and requirements for continued growth).

Although the Tribal Council may not have the present support of a considerable number of members of the Tribe, it is nonetheless the Tribe's only duly elected governing body. Nothing in the Constitution, the Gaming Ordinance, the Tribal/State Compact, or any other regulation suggests that, once elected, the Tribal Council needs the popular support of the Tribe's members to take action. Ms. Coyhis and her supporters on the

Tribal Council were elected pursuant to the procedures set forth in the Tribe's Constitution, and, to the extent the Tribe's members disagree with her politics, they must seek redress within the boundaries of that Constitution. In that regard, defendants can either attempt to obtain Ms. Coyhis's removal from the Council as provided for in the Constitution, or they may offer their own candidates for the Tribal Council in October, when the Tribe will hold its next election and five of the present Council members will be up for reelection.

For the reasons noted, I find that the issuance of preliminary injunctive relief is appropriate. The Community has demonstrated a likelihood of success on the merits, that it will suffer irreparable harm absent injunctive relief, and that monetary damages will not compensate it for the injuries sustained as a result of defendants' actions. Furthermore, the Community has demonstrated that the harm it will suffer outweighs any potential harm defendants might suffer, and that the entry of a preliminary injunction will best serve the public interest.

Accordingly, **IT IS ORDERED** that the motion for preliminary injunctive relief filed by the Stockbridge–Munsee Community Band of Mohican Indians, the plaintiffs in action number 94–C–709, is **GRANTED.** Defendants are hereby enjoined from (1) preventing Tribal Council members from gaining access to tribal headquarters; (2) preventing Tribal Council members from gaining access to the Casino; (3) interfering with the Tribal Council's ability to govern the Community or supervise the Casino (including but not limited to interfering with the Tribal Council's ability to change the signature cards on the Norwest Bank accounts and any other bank accounts opened by defendants with Casino proceeds); and (4) removing any funds and/or property from the Casino or tribal headquarters. No bond need be posted. If the defendants want to pursue the question of whether or not a special master should be appointed they may raise that subject with Judge Stadtmueller.

With the entry of this order, I conclude my involvement in these cases and return them to Judge Stadtmueller for further proceedings.