**Annette DAVIDS, Bert Davids, Shannon Miller, Verna Johnson–Miller, Sheila Powless, Robert Chicks, Leonard Miller III, Tammy Pecore, Virgil Murphy, and Linda Mohawk, Plaintiffs,**

v.

**Laura COYHIS, Harvey Martin, Arnold Tousey, and William Moede, Defendants.**

No. 94–C–689 (JPS).

United States District Court, E.D. Wisconsin.

Dec. 9, 1994.

See also, 857 F.Supp. 641.

Brian L. Pierson, Hall, Patterson & Charne, S.C., Milwaukee, WI, for plaintiffs.

Jerry W. Snider, Ann Marie Hanrahan, Richard A. Duncan, Randall E. Kahnke, Elizabeth M. Hendricks, Faegre & Benson, Minneapolis, MN, John Busch, Michael, Best & Friedrich, Milwaukee, WI, for defendants.

## DECISION AND ORDER ORDER

STADTMUELLER, District Judge.

On June 23, 1994, Annette Davids, Bert Davids, Shannon Miller, Verna Johnson–Miller, Sheila Powless, Robert Chicks, Leonard Miller III, and Tammy Pecore, all enrolled members of the Stockbridge–Munsee Community Band of Mohican Indians (the Community), filed this action against Laura Coyhis, Harvey Martin, Arnold Tousey, and William Moede, members of the Community's Tribal Council. The plaintiffs seek injunctive and declaratory relief for the defendants' alleged violations of the Indian Gaming Regulatory Act (IGRA), 25 U.S.C. §§ 2701–21. Before the court is the defendants' motion to dismiss.[1]

The Community is a federally recognized tribe which occupies a reservation in Shawano County, Wisconsin. The Community is governed by its Tribal Council, a seven-member body composed of a president, a vice

---

1. Also pending before the court is the plaintiffs' motion for a preliminary injunction. In light of my determination of the defendants' motion to dismiss, I will deny the plaintiffs' motion for a preliminary injunction as moot.

president, a treasurer, and four council members, who are elected by popular vote. All seven members have equal votes, and a simple majority rules. The present members of the Tribal Council, elected in December 1993, are Coyhis, president; Virgil Murphy, vice president; Linda Mohawk, treasurer; Steve Davids; Moede; Tousey; and Martin.

Through the Mohican North Star Casino and Bingo Enterprise, a separate, tribally chartered business organization, the Community owns and operates the Mohican North Star Casino (the Casino). The operations of the Casino are regulated by the IGRA, a Tribal–State compact between the Community and the State of Wisconsin, see 25 U.S.C. § 2710(d)(1)(C), and the Community's Gaming Ordinance, see id. § 2710(b)(1)(B), (b)(2), (d)(1)(A). The Gaming Ordinance provides for the establishment of a Gaming Board to monitor the Community's gaming enterprises and to ensure compliance with all policies, procedures, and regulations. The Gaming Board members are appointed by—and may be dismissed by—the Tribal Council. The Casino's management staff is responsible for day-to-day operations of the Casino. Two management staff positions, the general manager and the financial manager, are hired directly by the Tribal Council.

This case (and a related case [2]) arose out of political unrest in the Community. Earlier this year, relations between the members of the Tribal Council rifted. Coyhis, Moede, Tousey, and Martin formed a voting majority and took Council action without the cooperation or approval of the remaining three members. Apparently out of frustration at the majority's ability to control the Council's actions without their approval, the three minority members held a "special election" on June 18, 1994, to "elect" a new Tribal Council. Neither the special election nor the new council is recognized by the United States Department of the Interior's Bureau of Indian Affairs. The dissident Council members and their supporters refuse to recognize the authority of the majority led by Coyhis, resulting in considerable unrest within the Community.

The plaintiffs in this case are supporters of the dissident faction of the Tribal Council. Annette Davids, Bert Davids, Shannon Miller, Johnson–Miller, and Powless are members of the Community's Gaming Board; Chicks is the Community's director of economic development; Leonard Miller is the Casino's director of support services; and Pecore is the Casino's assistant general manager. The defendants are the four-member voting majority of the Tribal Council (the Coyhis group). The original complaint [3] filed by the plaintiffs alleged that the Coyhis group established an unauthorized bank account for the purpose of diverting gaming revenue from the Casino's special bank account. The establishment of this new account, the plaintiffs allege, constituted a violation of the Gaming Ordinance, which requires the Community to maintain a special account to hold only gaming receipts, with signature authority vested in the Casino's general manager and a designated member of the Gaming Board. The plaintiffs also allege that the Coyhis group appointed an acting treasurer and appropriated control over Community funds in violation of the Community's constitution. Finally, the plaintiffs allege that the Coyhis group appointed individuals to the Gaming Board who were not eligible to serve as members pursuant to the provisions of the Gaming Ordinance, and that they employed a Casino general manager without performing a background check in violation of the IGRA and the Tribal–State Compact.

In the second case, 857 F.Supp. 641, the Coyhis group, on behalf of the Community, filed a complaint against Bruce Miller, Darrel Mason, Leah Miller–Heath, Terry Terrio, Carolyn Miller, Greg Miller, Marcelene Sparks, Blake Smith, Dave Koller, Terrance J. Miller, Leonard ("John") Miller III, Tammy Pecore, Debra LeMieux, and Cynthia Harris, all enrolled members of the Community. Miller–Heath, Terrio, Carolyn Miller,

---

**2.** *The Stockbridge–Munsee Community Band of Mohican Indians v. Miller,* 857 F.Supp. 641 (E.D.Wis.1994).

**3.** The plaintiffs have since filed a motion for leave to amend the complaint, which the defendants oppose. *I discuss the amended complaint infra.*

Greg Miller, Sparks, Smith, and Koller are members of the unrecognized tribal council; Terrance J. Miller is the Casino's director of surveillance; LeMieux is the Casino's vault manager; and Harris is the Casino's assistant financial manager. Leonard Miller III and Pecore also are named as plaintiffs in this case, 857 F.Supp. 641. The Community's complaint in 857 F.Supp. 641 alleges that the defendants physically prevented the Coyhis group from entering the Community's government offices and the Casino, thus forcing them to set up temporary headquarters, denying them access to books and records necessary to govern the Community, and preventing them from supervising the Casino's operation. The· Community also alleges that the defendants wrongfully removed funds from the Casino, and that they refused to close the Casino temporarily to conduct an audit of funds and to alleviate any potential danger to Casino patrons and other members of the Community, despite a Tribal Council vote in favor of doing so. The Community alleges that the defendants' conduct violates RICO, 18 U.S.C. §§ 1961–68, the IGRA, and the Gaming Ordinance, and that the defendants' actions constitute a trespass of Community property and conversion of Community assets.

In response to the parties' concerns about the political instability within the Community, this court, through my colleague Chief Judge Terence T. Evans, held an evidentiary hearing in both cases with regard to the Community's motion for a preliminary injunction in 857 F.Supp. 641. Chief Judge Evans determined that the court had jurisdiction over the Community's claim that the defendants had prevented the Coyhis group from entering Community government offices, finding the defendants' challenge to the court's jurisdiction unpersuasive. After examining each of the factors necessary in determining whether preliminary injunctive relief is warranted, Chief Judge Evans granted the Community's motion and ordered that the defendants be enjoined from:

(1) preventing Tribal Council members from gaining access to tribal headquarters;

(2) preventing Tribal Council members from gaining access to the Casino; (3) interfering with the Tribal Council's ability to govern the Community or supervise the Casino (including but not limited to interfering with the Tribal Council's ability to change the signature cards on the Norwest Bank accounts and any other bank accounts opened by the defendants with Casino proceeds); and (4) removing any funds and/or property from the Casino or tribal headquarters.

■■■ Since the entry of Chief Judge Evans' order, the plaintiffs in 857 F.Supp. 641 have filed a motion for leave to amend their complaint.[4] The defendants oppose the motion, arguing that the amendments do not cure the flaws of the original complaint, addressed in the defendants' motion to dismiss. Under Fed.R.Civ.P. 15(a), "leave shall be freely given when justice so requires." Generally, a trial court need not grant leave to amend a complaint where the amendments would not survive a motion to dismiss or for summary judgment. See, e.g., Perkins v. Silverstein, 939 F.2d 463, 472 (7th Cir.1991) ("[A] district court may deny leave to amend if the proposed amendment fails to cure the deficiencies in the original pleading, or could not survive a second motion to dismiss."). Here, however, the amended complaint serves to clarify and simplify the plaintiffs' claims and the parties agree that the same challenges in the defendants' motion to dismiss are applicable to the amended complaint. For those reasons, I will grant the plaintiffs' motion for leave to amend the complaint and consider the defendants' motion to dismiss with reference to the amended complaint.

The plaintiffs' amended complaint names two additional plaintiffs: Virgil Murphy, the vice president of the Tribal Council, and Linda Mohawk, the treasurer of the Tribal Council. The plaintiffs assert federal question jurisdiction based on alleged violations of the IGRA and state four claims arising out of the alleged violations. The first claim alleges

---

4. Because the defendants filed a motion to dismiss before the plaintiffs filed an amended complaint, the plaintiffs may not amend the complaint without leave of the court. Fed.R.Civ.P. 15(a).

that the defendants' transfer of gaming funds from the original account to a new account and the change in the signatory authority, allowing the defendants to sign checks drawn on the account, violates the Tribal–State Compact and the Gaming Ordinance, and thus the IGRA.[5] The second claim alleges that the defendants have appropriated and expended Community funds, including gaming revenue, in violation of the Gaming Ordinance and therefore the IGRA. The plaintiffs' third claim alleges that the defendants appointed ineligible members to the Gaming Board in violation of the Gaming Ordinance, the Compact, and thus the IGRA. The plaintiffs' final claim alleges that the defendants have effected an illegal takeover of the Community's gaming enterprise, in violation of the IGRA.

The defendants' motion to dismiss[6] raises several challenges to the plaintiffs' complaint. The defendants argue that the court lacks jurisdiction based on tribal sovereign immunity, that the plaintiffs have failed to exhaust their administrative and tribal remedies, and that neither the IGRA, the Tribal–State Compact, nor the Gaming Ordinance provides a private right of action enabling the plaintiffs to bring suit.[7] Because I conclude that the IGRA neither waives tribal sovereign immunity nor creates a private cause of action against tribal officials, I will grant the defendants' motion to dismiss.

## I. SOVEREIGN IMMUNITY

The plaintiffs argue, essentially, that their action is not barred by tribal sovereign immunity for any of three reasons: (1) tribal sovereign immunity does not extend to suits seeking only injunctive or declaratory relief; (2) the Community has waived its sovereign immunity by engaging in the gaming regulated by the IGRA, at least for purposes of compliance with the IGRA; or (3) tribal sovereign immunity does not extend to the named defendants despite their status as tribal officials because the alleged actions taken by the defendants are outside the scope of their authority. Implicit in the last argument is the plaintiffs' contention that the IGRA provides a private right of action against tribal officials.

### A. Tribes

Our judicial system has long and consistently recognized Indian tribes as "distinct, independent political communities" that "retain[ ] their original natural rights" to exercise self-government. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)); *see also Three Affiliated Tribes v. Wold Engineering*, 476 U.S. 877, 890, 106 S.Ct. 2305, 2313, 90 L.Ed.2d 881 (1986) (referring to "Congress' jealous regard for Indian self-governance"). Though no longer "possessed of the full attributes of sovereignty," *United States v. Kagama*, 118 U.S. 375, 381, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886), Indian tribes enjoy the status of "domestic dependent nations" whose relation "to the United States resembles that of a ward to his guardian." *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). Although the tribes' power of self-

---

**5.** Under the IGRA's comprehensive scheme, tribes may conduct Class II gaming (essentially bingo and certain card games, *see* 25 U.S.C. § 2703(7)) if they adopt (and, the plaintiffs argue, abide by) an approved ordinance regulating the conduct of such gaming. *See id.* §§ 2710(b)(1)(B), 2710(b)(2). Tribes may conduct Class III gaming (any gaming not classified as Class I or II, *see id.* § 2703(8)) if they have adopted an ordinance authorizing such gaming, and if the gaming is conducted in conformance with the Tribal–State Compact. *See id.* §§ 2710(d)(1)(A), 2710(d)(1)(C).

**6.** The plaintiffs point out that the defendants' supporting brief contains a statement of facts properly included with a motion for summary

judgment, rather than a motion to dismiss. Thus, in their response, the plaintiffs rely on allegations outside of the pleadings and include several affidavits. Because my analysis of the defendants' motion does not reach any disputed facts and does not go beyond the allegations of the plaintiffs' complaint, I will treat the defendants' motion as one to dismiss.

**7.** Because the amended complaint alleges violations of the Compact and the Gaming Ordinance only in relation to the IGRA's provisions requiring tribes to adopt ordinances and enter into and comply with Tribal–State compacts in order to conduct certain classes of gaming, *see supra* n. 4, I only need consider whether the IGRA provides a private right of action.

government may be limited by federal statutes, treaties with the United States, or by the restraints implicit in a "guardian-ward" relationship, the tribes remain independent, self-governing political entities. Felix S. Cohen et al., *Handbook of Federal Indian Law* 235 (1982). Thus, the tribes retain the "power to make their own substantive law in internal matters and to enforce that law in their own forums." *Santa Clara Pueblo,* 436 U.S. at 55–56, 98 S.Ct. at 1675 (citations omitted); *accord United States v. Wheeler,* 435 U.S. 313, 322–23, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

■ Indian tribes also possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1677. As with other powers of self-government arising from tribal sovereignty, tribal sovereign immunity is subject to limitations imposed by federal statute. *Id.* "But 'without congressional authorization,' the 'Indian Nations are exempt from suit.'" *Id.* (quoting *United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 512, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940)).

■ Until recently,[8] the Supreme Court's cases left little doubt that a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1677 (quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969))). In *Santa Clara Pueblo,* the Court rather summarily rejected the contention that Title II of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–03, effectively waived tribal sovereign immunity from suit:

> Nothing on the face of Title I [II] of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief. . . . In the absence here of any unequivocal expression of contrary legislative intent, we conclude that suits against the

tribe under the ICRA are barred by its sovereign immunity from suit.

436 U.S. at 59, 98 S.Ct. at 1677.

In *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 111 S.Ct. 905, 112 L.Ed.2d 1112 (1991), however, the Court, while declining to "modify the long-established principle of tribal sovereign immunity," *id.* at 510, 111 S.Ct. at 909, nevertheless arguably called into question its earlier holdings of complete tribal immunity from suit. The issue before the Court was whether, under Public Law 280, a state may tax sales of goods to Indians and non-Indians on tribal land. *Id.* at 507, 111 S.Ct. at 908. The Court held that although sovereign immunity prevented the state from pursuing a lawsuit for past unpaid taxes, the state could collect taxes from future sales to non-Indians. Tribal sovereign immunity, the Court stated, "does not excuse a tribe from all obligations to assist in the collection of validly imposed state sales taxes." *Id.* at 512, 111 S.Ct. at 911. Justice Stevens, in his concurrence, characterized the Court's holding as a recognition "that a tribe's sovereign immunity from actions seeking money damages does not necessarily extend to actions seeking equitable relief." *Id.* at 516, 111 S.Ct. at 913 (Stevens, J., concurring).

■ The plaintiffs, in alleging violations of the IGRA as the basis for their claims against the defendants, argue that the IGRA waives tribal sovereign immunity. The plaintiffs do not argue that the IGRA contains an express waiver of tribal immunity; rather, they draw on *Oklahoma Tax Comm'n* for the proposition that tribal sovereign immunity does not extend to suits seeking equitable relief, and cite two recent district court cases holding that by engaging in the gaming regulated by the IGRA, tribes effectively waive their sovereign immunity with regard to compliance with the IGRA's provisions.

I am not inclined to accept as settled law the plaintiffs' contention that tribal sovereign immunity does not bar actions seeking only injunctive or declaratory relief. Justice Stevens' concurrence in *Oklahoma Tax Comm'n*

---

8. See the discussion of *Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738 (D.S.D.1992) and *Maxam v. Lower Sioux Indian Community,* 829 F.Supp. 277 (D.Minn.1993), *infra.*

aside,[9] it is my reading of the case law that tribal sovereign immunity, when in place, bars *any* suit against a tribe, regardless of the type of relief sought by the plaintiff.[10] In *Santa Clara Pueblo,* the respondents brought an action for declaratory and injunctive relief against the Pueblo and its Governor. 436 U.S. at 51, 98 S.Ct. at 1673. The Court's analysis did not turn on the type of relief sought; rather, the Court simply looked for an express waiver of immunity and, finding none, concluded that the suit against the Pueblo was barred. *See id.* at 58–59, 98 S.Ct. at 1677 ("Nothing on the face of [the Indian Civil Rights Act] purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief."). Were tribal sovereign immunity a bar only to actions seeking monetary damages as the plaintiffs contend, certainly the *Santa Clara Pueblo* Court would have reached a different result. *See also, e.g., Citizen Band Potawatomi Indian Tribe v. Oklahoma Tax Comm'n,* 969 F.2d 943, 947 (10th Cir.1992) (holding that although the tribe had "a legal obligation to assist in the collection of taxes on sales of cigarettes to nontribal members," "the Supreme Court's opinion [in *Oklahoma Tax Comm'n* ] does not permit the Tax Commission to enforce the Tribe's legal obligation through the federal courts"); *Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d 899, 901 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3013, 120 L.Ed.2d 887 (1992) (stating that the tribe was immune from suit despite the fact that plaintiffs alleged that the tribe acted outside the scope of its authority and sought only declaratory and injunctive relief).

The plaintiffs present no authority binding on this court which holds that by engaging in the gaming regulated by the IGRA, tribes waive their sovereign immunity with regard to compliance with the IGRA's provisions. The plaintiffs cite to two cases, one from the District of South Dakota and the other from the District of Minnesota, that so hold. However, I find neither persuasive.

In the first case on which the plaintiffs rely, *Ross v. Flandreau Santee Sioux Tribe,* 809 F.Supp. 738 (D.S.D.1992), the plaintiffs, members of the Flandreau Santee Sioux Tribe, challenged the Tribe's per capita payments of gaming revenue under the IGRA and asserted federal question jurisdiction based on the alleged violation of the IGRA. Section 2710(b)(3) of the IGRA allows tribes to use gaming revenue to make per capita payments to tribal members according to a plan approved by the Secretary of the Interior. The plaintiffs contended that because the Tribe's plan of distribution of the per capita payments had not been approved by the Secretary, the Tribe had violated the IGRA. The district court agreed that the Tribe's per capita distribution was in violation of the IGRA. 809 F.Supp. at 743. The district court rejected the Tribe's claim that the Tribe's sovereign immunity barred the plaintiffs' action:

> Having elected to engage in casino gambling under the IGRA, the tribe is required to comply with that law. The Court is well aware of the extensive case law holding that waivers of sovereign immunity by an Indian tribe must be unequivocally expressed. However, the Tribe cannot reap the benefits of the IGRA and simultaneously refuse to comply with the statutorily mandated provisions relating to the distribution of Indian gaming revenues.

As the United States Supreme Court recognized in *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505 [111 S.Ct. 905, 112 L.Ed.2d 1112] (1991), tribal sovereign immunity does not excuse

---

9. I agree with the Tenth Circuit's assessment of Justice Stevens' concurrence:

> While Justice Stevens suggested that "a tribe's sovereign immunity from actions seeking money damages does not necessarily extend to actions seeking equitable relief," *Oklahoma Tax Comm'n,* 498 U.S. at 516, 111 S.Ct. at 913 (Stevens, J., concurring), this view was not shared by any other member of the Court and was implicitly rejected in the majority

opinion's discussion of alternative remedies. *See id.* at 514, 111 S.Ct. at 912.

*Citizen Band Potawatomi Indian Tribe v. Oklahoma Tax Comm'n,* 969 F.2d 943, 948 n. 5 (10th Cir.1992).

10. Suits against individual tribal officials acting outside the scope of their authority are a different matter, which I discuss *infra.*

an Indian tribe from all obligations. *Id.* [at 512, 111 S.Ct. at 911]. By engaging in Class II and Class III gaming the Tribe has assumed certain obligations, and by not complying with the IGRA in distributing gaming profits the Tribe has failed to satisfy those obligations. As Justice Stevens' concurrence points out, the *Potawatomi* Court impliedly recognized that tribal sovereign immunity does not necessarily extend to actions seeking equitable relief. *Id.* [at 516, 111 S.Ct. at 913] (Stevens, J., concurring). Sovereign immunity cannot be invoked to preclude an inquiry into whether the Tribe has complied with the IGRA. Engaging in gaming pursuant to the IGRA constitutes an express waiver of sovereign immunity on the issue of compliance with the IGRA. To hold otherwise would make 25 U.S.C. § 2710(b)(3) a nullity.

*Ross,* 809 F.Supp. at 744–45 (parallel citations omitted).

The second case on which the plaintiffs rely, *Maxam v. Lower Sioux Indian Community,* 829 F.Supp. 277 (D.Minn.1993), addressed the same issue in the context of the plaintiffs' motion for a preliminary injunction. The *Maxam* court likewise rejected the defendants' claim of sovereign immunity:

It is well-established that Indian tribes have immunity to suit in federal court absent congressional abrogation or a clear waiver by the tribe. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 58 [98 S.Ct. 1670, 1676–77, 56 L.Ed.2d 106] (1978). However, the IGRA, which provides authority for tribes to engage in gaming, makes Indian gaming subject to the conditions and requirements of the Act. Any tribe which elects to reap the benefits of gaming authority created by the IGRA must comply with the Act's requirements. *See Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 512–15 [111 S.Ct. 905, 910–12, 112 L.Ed.2d 111] [1991] (tribal sovereign immunity does not excuse tribes from all legal obligations).

The Community's decision to conduct Class II gaming pursuant to the IGRA constitutes a clear waiver of sovereign immunity for the purpose of enforcement of the requirements imposed as a statutory condition of permission to engage in such activities. Any other understanding of the Act would render the requirements of the IGRA a nullity by allowing Indian tribes to conduct gaming in violation of the Act with impunity. The court must conclude that when an Indian tribe engages in gaming governed by the IGRA, it waives its immunity to suit for the narrow purpose of determining compliance with the requirements of the Act.

*Maxam,* 829 F.Supp. at 281 (parallel citations omitted).

I am reluctant to follow the reasoning of these cases because I believe that they are contrary to the Supreme Court's holding in *Santa Clara Pueblo.* I do not read *Oklahoma Tax Comm'n* as a wholesale rejection of the Court's long-standing doctrine of tribal sovereign immunity, as *Ross* and *Maxam* seem to. To my knowledge, it is still the law of the land that "a waiver of sovereign immunity ' "*cannot be implied* but must be unequivocally expressed." ' " *Santa Clara Pueblo,* 436 U.S. at 58, 98 S.Ct. at 1676–77 (quoting *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) (quoting *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969))) (emphasis added). Despite the conclusions reached by the *Ross* and *Maxam* courts, I believe that Supreme Court precedent constrains me from finding an unequivocal expression of a waiver of tribal sovereign immunity through inference from a tribe's actions. *See Maynard v. Narragansett Indian Tribe,* 984 F.2d 14, 16 (1st Cir.1993) ("[Plaintiff] invites us to *infer* a waiver or abrogation of the Tribe's sovereign immunity, citing to the settlement agreement, the enacting legislation, and excerpts from the legislative history.... [H]owever, the proposed inferential leap is impermissible."); *American Indian Agric. Credit Consortium v. Standing Rock Sioux Tribe,* 780 F.2d 1374 (8th Cir.1985) (reversing on ground that district court's finding that tribe had "clearly and unequivocally indicate[d]" consent to suit on loan was contrary to *Santa Clara Pueblo* 's rule that waiver of tribal sovereign im-

munity cannot be implied but must be unequivocally expressed); *cf. Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993) (finding express waiver of tribal sovereign immunity in tribal subdivision's charter and in contract at issue); *see also* Black's Law Dictionary 521 (5th ed. 1979) ("Express. Clear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference.... Manifested by direct and appropriate language, as distinguished from that which is inferred from conduct.") Therefore, without an "unequivocally expressed" congressional waiver of tribal sovereign immunity, I must conclude that the Community has not "effectively waived" its sovereign immunity simply by engaging in the gaming regulated by the IGRA.

## B. Tribal Officials

Unfortunately, my conclusion that the Community has not waived its sovereign immunity does not end my analysis of the parties' contentions. The plaintiffs argue that they are not suing the Community, but four tribal officers who have acted outside the scope of their authority; thus, it is entirely appropriate for the plaintiffs to seek declaratory and injunctive relief against the defendants in federal court. The defendants answer that there is no private cause of action

against tribal officials either on the face of or implied in the IGRA.[11]

■ Several circuits, most notably the Ninth Circuit, have held explicitly that tribal sovereign immunity extends to tribal officials.[12] *See, e.g., Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d 899, 901 (9th Cir.1991) ("[T]ribal sovereign immunity does not bar a suit for prospective relief against tribal officers allegedly acting in violation of federal law."); *Weeks Constr., Inc. v. Oglala Sioux Housing Auth.,* 797 F.2d 668, 670–71 (8th Cir.1986) ("As an arm of tribal government, a tribal housing authority possesses attributes of tribal sovereignty, and suits against an agency like the Housing Authority normally are barred absent a waiver of sovereign immunity."); *Hardin v. White Mountain Apache Tribe,* 779 F.2d 476, 479 (9th Cir.1985) ("[T]ribal immunity extends to individual tribal officials acting in their representative capacity and within the scope of their authority."); *accord, e.g., Cameron v. Bay Mills Indian Community,* 843 F.Supp. 334, 336 (W.D.Mich.1994) ("Tribal immunity extends to individual tribal officials acting in their representative capacity within the scope of their authority.").

Sovereign immunity does not bar injunctive or declaratory relief against individual tribal officials who allegedly acted outside the scope of their authority. *See Puyallup Tribe, Inc. v. Department of Game,* 433 U.S.

---

**11.** The plaintiffs' assertion that the defendants have acted outside the scope of their authority is complicated somewhat by the rather convoluted allegations concerning how the defendants have exceeded their authority. The plaintiffs allege that the defendants have violated not only the Gaming Ordinance, the Compact, and the IGRA through their actions, but the Community's constitution and by-laws as well. Because the plaintiffs have asserted federal question jurisdiction based on alleged violations of the IGRA, I will limit my analysis to the defendants' alleged violations of the IGRA as the basis of the defendants' alleged unauthorized actions (i.e., the defendants acted outside the scope of their authority because they violated the IGRA). I decline, without explicit and adequately briefed invitation, to address whether a tribal official's violation of a tribal ordinance, the Tribal–State gaming compact, tribal constitution, or tribal by-laws creates a private cause of action against the tribal official.

**12.** The plaintiffs assert that "[t]he United States Supreme Court has held unequivocally that sovereign immunity does not protect tribal officers." In support, the plaintiffs cite to the statement in *Santa Clara Pueblo* that "[a]s an officer of the Pueblo, petitioner Lucario Padilla [the Pueblo's governor] is not protected by the Tribe's immunity from suit." 436 U.S. at 59, 98 S.Ct. at 1677. The plaintiffs overlook the fact that the Pueblo's governor was alleged to have acted in violation of the Indian Civil Rights Act. Though perhaps ambiguous in its brevity, I believe the sentence relied on by the plaintiffs best is understood as an extension of the *Ex parte Young* doctrine to tribal officials. *See Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d at 901 ("No reason has been suggested for not applying [the *Ex parte Young* doctrine] to tribal officials, and the Supreme Court suggested its applicability in *Santa Clara Pueblo*....").

165, 171, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977) ("[W]hether or not the tribe itself may be sued in a state court without its consent or that of Congress, a suit to enjoin violations of state law by individual tribal members [and tribal officials] is permissible."); *see also Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Burlington Northern R.R. Co. v. Blackfeet Tribe,* 924 F.2d at 901–02.

■. Assuming the truth of the allegations in the plaintiffs' complaint, as I must in determining a motion to dismiss, *see, e.g., Kernats v. O'Sullivan,* 35 F.3d 1171, 1175 (7th Cir.1994), if the defendants' actions are in violation of the IGRA, then the defendants have acted outside the scope of their authority, because tribes are not authorized to conduct Class II and III gaming in violation of the IGRA's provisions. *See* 25 U.S.C. § 2713 (providing authority for NIGC to levy civil fines against or order temporary closure of Indian gaming for violations of the IGRA's provisions). Once again, unfortunately, my analysis does not end there. Even assuming that the defendants acted in violation of the IGRA and therefore outside the scope of their authority, plaintiffs cannot sue the defendants for violations of the IGRA unless such a cause of action is implicit in the IGRA. *See Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677 ("As an officer of the Pueblo, petitioner ... is not protected by the tribe's immunity from suit.... We must therefore determine whether the cause of action for declaratory and injunctive relief asserted here by respondents, though not expressly authorized by the [Indian Civil Rights Act], is nonetheless implicit in its terms.").

■ Generally, in determining whether a cause of action is implicit in a statute that does not expressly provide one, a court must consider four factors:

First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a rem-

edy for the plaintiff? And finally, is the cause of action one traditionally relegated to state [or tribal] law, in an area basically the concern of the States [or tribes], so that it would be inappropriate to infer a cause of action based solely on federal law?

*Santa Clara Pueblo,* 436 U.S. at 60–61 n. 10, 98 S.Ct. at 1678–79 n. 10 (quoting *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975) (quoting *Texas & Pacific R. Co. v. Rigsby,* 241 U.S. 33, 39, 36 S.Ct. 482, 484, 60 L.Ed. 874 (1916))) (citations omitted) (alterations in original).

■ The plaintiffs again rely on *Ross* and *Maxam,* this time citing the cases for the proposition that a private cause of action is implied in the IGRA. However, I find no substantive difference in the reasons asserted by the *Ross* and *Maxam* courts for inferring a waiver of tribal sovereign immunity and a private cause of action in the IGRA, and those reasons considered and rejected in *Santa Clara Pueblo* with regard to the Indian Civil Rights Act.

The congressional purpose in enacting the IGRA, in part, was to "promot[e] tribal economic development, self-sufficiency, and strong tribal governments," as well as "to assure that gaming is conducted fairly and honestly." 25 U.S.C. § 2702(1), (2). Certainly tribal members benefit from these goals of the IGRA.

The IGRA contains no explicit private cause of action against tribal officers. The plaintiffs do not argue, beyond relying on *Ross* and *Maxam,* that there is any indication of a congressional intent to create such a remedy, and my reading of the IGRA's legislative history does not disclose any such indication. *See* S.Rep. No. 446, 100th Cong., 2d Sess. (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071–106. Indeed, the IGRA's specific grant of federal jurisdiction for certain types of actions indicates that Congress intended to limit federal jurisdiction to those instances. *See* 25 U.S.C. § 2710(d)(7)(A); *see also Santa Clara Pueblo,* 436 U.S. at 61, 98 S.Ct. at 1679 ("[T]he structure of the statutory scheme and the legislative history of Title [II] [of the Indian Civil Rights Act] suggest that Congress' failure to provide remedies

other than habeas corpus was a deliberate one.").

I now turn to the *Santa Clara Pueblo* Court's more specific considerations regarding tribal sovereignty. In determining whether a cause of action against tribal officers was implicit in the ICRA, the Court discussed the "competing purposes" of the ICRA. On one hand, "a central purpose of the ICRA ... was to 'secur[e] for the American Indian the broad constitutional rights afforded to other Americans,' and thereby to 'protect individual Indians from arbitrary and unjust actions of tribal governments,'" *Santa Clara Pueblo,* 436 U.S. at 61, 98 S.Ct. at 1678 (quoting S.Rep. No. 841, 90th Cong., 1st Sess., 5–6 (1967); on the other hand, the Court found that "Congress also intended to promote the well-established federal 'policy of furthering Indian self-government.'" *Id.* at 62, 98 S.Ct. at 1679 (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974)). The Court cautioned that "[w]here Congress seeks to promote dual objectives in a single statute, courts must be more than usually hesitant to infer from its silence a cause of action that, while serving one legislative purpose, will disserve the other." *Id.* at 64, 98 S.Ct. at 1680. The Court concluded that given Congress' intent to promote tribal self-determination, a private cause of action against tribal officers was not implicit in ICRA. "Creation of a federal cause of action for the enforcement of rights created in Title I [of the ICRA], however useful it might be in securing compliance with [the ICRA's provisions], plainly would be at odds with the congressional goal of protecting tribal self-government. Not only would it undermine the authority of tribal forums, but it would also impose serious financial burdens on already 'financially disadvantaged' tribes." *Id.*

The competing-purposes consideration is equally valid with regard to the IGRA. The stated policies underlying the IGRA are provided in 25 U.S.C. § 2702:

The purpose of this chapter is—

(1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;

(2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and

(3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and to protect such gaming as a means of generating tribal revenue.

As with the ICRA, then, the IGRA has competing purposes: it allows tribes to conduct gaming on Indian lands as a way of promoting strong tribal governments, but it also removes much of the control of the gaming from the tribes by providing a federal regulatory scheme. And as in *Santa Clara Pueblo,* then, courts should be hesitant to infer a federal cause of action (and therefore a waiver of tribal sovereign immunity) where it would disserve the stated congressional purpose of promoting tribal economic development, self-sufficiency, and strong tribal governments. To infer a waiver of tribal sovereign immunity and therefore a federal cause of action would disserve the congressional policy of promoting strong tribal governments because, as the plaintiffs attempt to do here, any federal remedy would supplant the tribes' ability to determine "disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo,* 436 U.S. at 65, 98 S.Ct. at 1681. Further, with regard to the particular facts of this case, it would oblige the federal courts to enter the quagmire of political dissension in the Community's governing body.

The *Santa Clara Pueblo* Court also found that a federal cause of action was not necessary to achieve the congressional intent of

securing certain constitutional rights for Native Americans:

> Tribal forums are available to vindicate rights created by the ICRA, and § 1302 has the substantial and intended effect of changing the law which these forums are obliged to apply. Tribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians.

*Id.* at 65, 98 S.Ct. at 1680–81.

■■■ Both *Ross* and *Maxam* seem to assume that without a federal cause of action against the tribes, the regulations imposed by the IGRA would be "a nullity." *Maxam,* 829 F.Supp. at 281; *Ross,* 809 F.Supp. at 745. The IGRA, however, is not without enforcement provisions. It creates the National Indian Gaming Commission (NIGC), which has the power to approve (and therefore disapprove) tribal gaming ordinances and management contracts, issue temporary or permanent orders to close gaming, and to levy and collect civil fines. 25 U.S.C. §§ 2705, 2713. The NIGC also has authority to monitor and inspect Class II gaming. *Id.* § 2706(b). The NIGC's decisions are final agency decisions for purposes of appeal in federal district court. *Id.* § 2714. Additionally, the IGRA provides for federal jurisdiction over three types of actions: (1) any cause of action initiated by a tribe for failure of a state to enter into or conduct in good faith Tribal–State compact negotiations; (2) any cause of action initiated by a state or tribe to enjoin Class III gaming conducted in violation of the Tribal–State compact; and (3) any cause of action initiated by the Secretary of the Interior to enforce Tribal–State compact mediation. *Id.* § 2710(d)(7)(A)(ii). And, of course, presumably the Community has its own enforcement procedures in place to ensure compliance with its ordinances.[13] Thus, I find it difficult to conclude that a federal cause of action, initiated by individual tribal members against other tribal members, is necessary to enforce the IGRA's provisions.

Given all of these considerations, I find it "highly unlikely that Congress would have intended a private cause of action for injunctive and declaratory relief to be available in the federal courts to secure enforcement" of the IGRA's provisions, other than those actions specifically provided for in the IGRA. *Santa Clara Pueblo,* 436 U.S. at 69, 98 S.Ct. at 1682. Congress certainly has the power to authorize civil actions by private parties against tribal officers under the IGRA, but it has chosen not to do so. I will not take it upon myself, without a clearer direction from Congress, to permit the intrusion on tribal sovereignty that adjudication of this action would represent.

Accordingly,

**IT IS ORDERED** that the motion to dismiss, filed by the defendants, be and the same is hereby **GRANTED;**

**IT IS FURTHER ORDERED** that the motion for a preliminary injunction, filed by the plaintiffs, be and the same is hereby **DENIED** as moot; and,

**IT IS FURTHER ORDERED** that this action be **DISMISSED** with prejudice.

The clerk is directed to enter judgment accordingly.

---

**13.** Obviously, then, the plaintiffs in this case are not left without a remedy. By my count, the plaintiffs have at least three alternatives to this action: (1) the plaintiffs could bring the alleged violations to the attention of the NIGC, which has the power to enforce the IGRA's provisions and tribal ordinances through civil fines of up to $25,000 per violation and temporary or permanent closures of gaming operations, *see* 25 U.S.C. § 2713; (2) the plaintiffs could bring the alleged violations to the attention of the State, which is authorized to initiate an action in federal district court to enjoin Class III gaming conducted in violation of the Tribal–State Compact, *see* id. § 2710(d)(7)(A)(ii); or (3) the plaintiffs could pursue whatever remedies, tribal or otherwise, that may be provided by the terms of the Compact or the Ordinance. And, should these remedies prove unsatisfactory, the plaintiffs "may of course seek appropriate legislation from Congress." *Oklahoma Tax Comm'n,* 498 U.S. at 514, 111 S.Ct. at 912.